UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
DEANNA HACH,                                    :
                                                :
                                    Plaintiff,  :        MEMORANDUM & ORDER
                                                :
                -against-                       :        07-CV-2517 (ENV)
                                                :
MICHAEL J. ASTRUE,[1] Commissioner of Social    :
Security,                                       :
                                                :
                                    Defendant.  :
-------------------------------------------------------------------- x

**VITALIANO, D.J.**

Plaintiff Deanna Hach seeks review, pursuant to 42 U.S.C. § 405(g), of the final decision

of the Commissioner of Social Security (the "Commissioner") denying her application for

disability insurance benefits under the Social Security Act (the "Act"). The parties have filed

cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

Hach argues that substantial evidence supports a finding of disability and asks the Court to

remand for the purpose of calculating benefits or, in the alternative, to remand for further

development of the record. The Commissioner argues that he correctly applied the relevant legal

standards and that his conclusion that Hach is not disabled within the meaning of the Act is

supported by substantial evidence. For the reasons set forth below, the Court denies the

Commissioner's motion, and grants Hach's cross-motion to the extent that this matter is

remanded to the Commissioner for reconsideration consistent with this Memorandum and Order.

### **Background**

**I.      Procedural History**

---

[1]     Although plaintiff originally brought this action against Commissioner of Social Security Jo Anne B.
Barnhart, Michael J. Astrue took over the office on February 12, 2007. Pursuant to Federal Rule of
Civil Procedure 25(d), he is automatically substituted as the defendant in this action.

1

On December 13, 2004, Hach filed an application for disability insurance benefits due to severe back pain, alleging a disability onset date of April 4, 2003. (R. at 47-49.)[2] The Social Security Administration ("SSA") denied the application on February 16, 2005, finding that her "condition is not severe enough" to prevent her from working in her prior job as an advertising manager. (R. at 43-46.) On October 17, 2006, a hearing was held before ALJ Seymour Fier in Queens, New York. Hach, who was and remains represented by counsel, appeared and testified, as did medical expert Dr. Bernard Gussoff and vocational expert Amy Leopold. (R. at 219-48.)

In a November 14, 2006 written decision, the ALJ denied Hach's claim, concluding that she was not disabled within the meaning of the Act from April 4, 2003 through the date of the decision. (R. at 17-23.) The decision of the ALJ became the final decision of the Commissioner on May 3, 2007, when the Appeals Counsel denied Hach's request for review. (R. at 4-6.) Hach timely filed this action on June 22, 2007.

## II. Life Story and Work Experience

At the time of the ALJ's decision, Hach was 40 years old, with one year of a college education. She had previously worked as a traffic manager and supervisor for an advertising agency, spanning from 1988 until the date of her claimed disability. (R. at 58-63.) According to forms that she submitted to the SSA, her employment in that position encompassed "computer work, clerical duties, group coordination, [and] prepar[ing] spreadsheets and status reports." (R. at 67.) The job required that she walk for (approximately) two hours per day, stand for two hours per day, sit for four hours per day, and stoop, kneel, or crouch for one hour per day. She reported that she had to lift items weighing as much as 20 pounds, but "frequently" had to lift

---

[2]   Citations to the underlying administrative record are designated as "R".

items less than 10 pounds, including "files, storage boxes, [and] office supplies."[3] (R. at 58, 67.)

Hach's troubles began in 2001, when she underwent surgery on her lower back for a herniated disc. Although she felt significantly better after the surgery, and returned to work in January 2002, her lower back and leg pain returned in March of the following year, prompting her to leave work for the current alleged disability in April 2003. (R. at 226.) Hach testified before the ALJ that she feels "shooting, stabbing pain" in her back that radiates into her right hip, thigh, and groin area, for which she takes "Advil, Aleve, [or] Tylenol." (R. at 228-29.) She has pain every day and "never, ever feels 100 percent" (R. at 229), but, by the time of the hearing, she was not taking any prescription medication because the medication had negatively affected her blood pressure. (R. at 224.) She claims to frequently get aggravation of her back strains, and that "the littlest things" can cause a flare-up, such as "cleaning the kitchen countertop." (R. at 231.)

Hach described her daily activities both at the hearing and in written statements she made as part of her application to the SSA on January 11, 2005. (R. at 81-91, 224-31.) On a typical day, Hach prepares a light breakfast, takes a shower, takes a short walk, prepares a light lunch, and then rests at home by reading and/or watching television, often while laying on the couch and propping her legs up with a pillow to take pressure off of her spine. (R. at 82, 224.) She is able to do "only very light housekeeping," although it causes her some pain, and she claims that she is unable to do any activity involving bending, stretching or lifting. (R. at 84.) She tries to get outside each day, weather permitting, and runs some "small neighborhood" errands, such as shopping for about half an hour two times a month. (R. at 85.) She also meets friends and family for a meal twice a month, goes to the library twice a month, and both visits her mother and

_____

[3] The standardized form provided by the SSA defined "frequently" as "from 1/3 to 2/3 of the workday." (R. at 67.)

attends church services weekly. (R. at 86.) In describing her physical abilities, she claims that she cannot stand longer than 20 minutes, walk longer than 30 minutes, or sit longer than 45 minutes. (R. at 86-87.) She does not use a cane or a back brace. (R. at 225-26).

A potential discrepancy between Hach's written submissions and her oral testimony involves her ability to drive a motor vehicle. In her submissions, Hach explained that she only drove "locally", and that she would have to get out of the car to stretch every 45 minutes due to back pain and tightening. (R. at 84.) However, at the hearing, she stated that the last time she drove a car was "two, three years ago." (R. at 224.) Upon questioning from the ALJ, Hach attempted to clarify by explaining, "I wrote that I drive a car, but I really haven't driven. Since I wrote that down, I haven't even driven at all." (R. at 225.) She occasionally uses public transportation for "five-minute" rides, but she mostly walks to her appointments. (R. at 226.)

## III.   Medical Evidence

In August 2001, an MRI on Hach's lumbar spine revealed a large central and right-sided herniated disc at L4-5 with moderate to severe compression of the thecal sac, severe right L5 nerve root impingement, and moderate left-sided neural compression. (R. at 134.) Her treating orthopedic surgeon, Dr. Vincent Leone, diagnosed a herniated disc at L4-5 with radiculopathy and impending foot drop. (R. at 141.) Hach underwent a lumbar laminectomy and discectomy at L4-5 on September 6, 2001. (R. 142-43.)

### A.   Treating Physician – Dr. Vincent Leone

Hach returned to Dr. Leone on April 7, 2003 with renewed lower back pain radiating into the right hip after she had been sitting for prolonged periods of time at work. Hach reported significant pain and right leg fatigue, but "denie[d] any radicular symptoms as pre-op."[4] (R. at

---

[4]   The administrative record includes medical reports from Dr. Leone detailing his treatment of plaintiff, including information about her self-reports, results of physical examinations, and treatment plans.

101.) Dr. Leone's physical examination revealed a positive straight leg raise test, right greater than left producing back pain, 2/4 reflexes symmetrical to knee jerk and 1/4 to ankle jerks. Although Dr. Leone found a negative femoral stretch test bilaterally, Hach was "otherwise grossly neurologically intact" with "minimal tenderness to palpation over the lumbar spine." He prescribed painkillers and concluded that Hach should remain out of work for 10 days. (R. at 101.) On April 14, 2003, Hach reported more leg pain than back pain, and tingling to the ankle. Examination results were unchanged, but Dr. Leone recommended that Hach stay out of work, ordered an MRI of the lumbar spine, and prescribed another painkiller. (R. at 102.)

An April 25, 2003 MRI revealed the previous right-sided laminectomy at L4-5, a moderate to large recurrent right-sided extruded disc, and a severe compression of the origin and descending right L5 root. (R. at 133.) Five days later, Dr. Leone concluded that the morphology of the disc indicated a recurrent (as opposed to residual) herniation. (R. at 104.) Hach reported that while her back pain was the same, the leg pain was getting worse, and she continued to have numbness and tingling. Dr. Leone recommended a conservative treatment plan including epidural injections to avoid repeat surgery. He deemed Hach "disabled regarding her job until further notice." (R. at 104.)

Hach's next visit came on May 14, 2003, when she reported that she felt "30% better" following her first epidural procedure. A physical exam revealed motor strength 4/5 throughout, intact sensation, reflexes symmetrical to knee jerk and ankle jerk, a positive straight leg raise test on the right producing right leg pain, and a positive bowstring sign on the right. Dr. Leone hoped to avoid surgery because "further destabilization of the back would require fusion", which in turn could cause "early degeneration of the juxtapositional level at L3-4" and "snowball" her condition. Instead, he suggested that she continue receiving epidural injections. (R. at 105.)

5

On June 4, 2003, Hach reported her back pain "60-65% improved," no radiculopathy below her hips, and that she "can live with her present level of functioning." In light of the success of the epidurals, Dr. Leone recommended holding off from physical therapy to avoid flare-ups. (R. at 106.) On June 30, Hach reported that she was doing "somewhat better" and had no need for oral medication. She suffered from occasional right hip and leg cramping, but a physical examination revealed that she was neurologically intact with "mildly positive tension signs" and a full range of motion. Dr. Leone recommended reinstituting physical therapy, and told Hach to remain out of work for six to eight weeks, over which time she "continue[d] to be 100% disabled regarding work." (R. at 107.)

By August 4, 2003, plaintiff stated that by decreasing her activity level her pain on average was a "2 out of 10," and that she rarely had radicular symptoms. She expressed concern that returning to work or instituting physical therapy would aggravate her pain and result in more surgery. After discussing all of the options, it was decided that she would wait another four to eight weeks and then make a determination regarding a return to work. (R. at 110.)

On September 3, 2003, Hach reported feeling better, although some right hip and thigh pain had recently returned. She noted that she had lost her job and was feeling depressed, and elected to defer surgery and physical therapy. Dr. Leone considered Hach to remain 100% disabled regarding work. (R. at 111.) On September 29, Hach's hip and radicular symptoms were completely resolved, and she experienced only mild back discomfort. On physical examination, Hach was able to squat from a standing position, had a negative straight leg raise test bilaterally and no tension signs to either extremity. Dr. Leone recommended continuing conservative treatment for another month and holding off physical therapy out of concern that Hach would relapse. (R. at 112.) Again, on October 27, 2003, Hach did not have any recurrence

of radicular symptoms and was willing to try physical therapy. (R. at 113.) By November 26, 2003, Hach stopped going to physical therapy, but her leg had "calmed down to a 0 out of 10 pain". Dr. Leone continued to state that Hach was 100% disabled regarding work. (R. at 115.)

Hach met with Dr. Leone four times in 2004. On February 18, Hach reported that she was "doing pretty well" aside from "two minor flare-ups," and was not taking oral medication aside from Tylenol. A physical examination revealed a full range of motion, and that she was grossly neurologically intact. Knee jerks and ankle jerks were both 2/4 and bilateral. Dr. Leone recommended continuing conservative treatment and a follow-up MRI. (R. at 116.) On June 7, Hach "continue[d] to feel well," had no radicular complaints, and reported occasional back stiffness but no back pain. Dr. Leone gave Hach the option of going back to work, but she preferred to "hold off at this point." (R. at 117.) On September 27, 2004, Hach reported occasional symptoms in the right hip triggered by housecleaning but "all the radiculopathy is resolving" and she had very little back pain. (R. at 118.) On October 25, 2004, an updated MRI revealed resorption of the extruded recurrent disc herniation fragment, although there was some concern that she would reherniate again if she returned to work. (R. at 120.)

Dr. Leone met with Hach five times in 2005, throughout which he maintained that she was disabled regarding work. On February 9, Hach reported some back symptoms with radicular pain into her buttock, but no return of radiculopathy below the knee. A physical exam revealed right and left paravertebral muscular tenderness, motor strength 5/5 throughout, and grossly intact sensation. (R. at 172.) On May 4, Hach reported occasional back pain and radicular symptoms into the right hip, and that she was taking Tylenol and Advil for the discomfort. (R. at 171.) She exhibited a diminished range of motion but was grossly neurologically intact. On July 6, Hach's low back and right hip pain persisted, but there were no new symptoms. (R. at 170.)

On August 10, Hach reported that she was feeling "okay", but that some back and right leg pain persisted. (R. at 169.) On October 5, Hach told Dr. Leone that her right thigh pain would "come and go", and that a recent flare-up was "resolving on its own." (R. at 168.)

On January 4, 2006, Hach reported a recent exacerbation of her back pain radiating into both thighs that she believed may have resulted from increased activity over the holiday season. (R. at 167.) However, a physical exam once again revealed no interval change. The final reported meeting with Dr. Leone was on April 5, 2006, when Hach reported similar pain symptoms and that she was taking Tylenol and Advil. (R. at 166.) Dr. Leone continued to recommend conservative treatment.

In addition to the plethora of treatment meetings detailed above, the administrative record also includes two "residual functional capacity" questionnaires filled out by Dr. Leone. The first, from March 10, 2006, listed a diagnosis of a lumbar herniated disc with radiculopathy, with a "poor for complete recovery" prognosis. (R. at 157.) Dr. Leone listed a reduced range of motion, a positive straight leg raising test, abnormal gait, sensory loss, reflex changes, and tenderness. (R. at 157-58.) He further explained that Hach could sit and stand for approximately 30 minutes at a time without having to move, and could sit and stand or walk less than 2 hours in an 8 hour workday. (R. at 159.) Dr. Leone also stated that Hach could "rarely" lift less than 10 pounds, and never lift more than that. (Id.) He estimated that Hach would have to be absent from work four days per month. (R. at 160.) The second questionnaire, filled out on August 10, 2006, lists similar limitations, although Dr. Leone provided that Hach could "occasionally" lift less than 10 pounds, "rarely" lift 10 pounds, and "never" lift more than that. (R. at 164.) He also stated that Hach should never twist, stoop, crouch or bend, and would likely be absent from work "more than four days per month." (R. at 165.)

8

On April 4, 2007, Dr. Leone drafted a letter explaining that he treated Hach roughly every six weeks since August 2001, and broadly explained his "conservative" treatment plan. (R. at 209-10.) He described "permanent physical limitations to the lumbar spine" and his opinion was that Hach's limitations were "originally the result of a disc herniation and subsequent reherniation, which produced the degenerative condition in the lumbar spine and that lumbar spinal level, which is permanent and irreversible in the form of posttraumatic arthritis." (R. at 209-10.) In light of the resulting pain and stiffness, he determined that the "arthritic condition" rendered Hach "totally disabled and unable to work even in a sedentary position since she cannot sit or stand in one position for more than 15 minutes without a break." (R. at 210.)

B.  Consulting Physician – Dr. Dyana Aldea

At the request of the SSA, Dr. Aldea examined Hach on February 3, 2005 and wrote a medical report. (R. at 145-49.) Dr. Aldea recorded Hach's complaint that she suffered from "dull" low back pain that "at times . . . can be sharp." (R. at 145.) In giving her medical history, Hach rated this pain a 6 out of 10 in intensity, and it occurred for at least an hour a day, though worse in the mornings. The pain was not accompanied by numbness, but was aggravated by prolonged standing or sitting, as well as slight squatting and bending. Hach reported that she was not currently taking any medications or using any assistive devices for ambulation. (R. at 145-46.)

Dr. Aldea's physical examination revealed intact hand and finger dexterity, full flexion, extension, lateral flexion, and rotary movements bilaterally of the cervical spine, and full use of the upper extremities. (R. at 146.) With respect to the thoracic and lumbar spines, extension was limited to 10 degrees, flexion was limited to 50 degrees complaining of low back pain, and lateral and rotary movements were limited to 20 degrees bilaterally. (R. at 147.) There was no

9

spinal tenderness, moderate SI joint tenderness bilaterally, no spasms, no scoliosis, and no trigger points. (R. at 147.) Dr. Aldea noted that Hach was "in no acute distress," had normal gait, was able to walk on her heels without difficulty, and had normal station. (R. at 146.) Hach needed no help changing for the exam, getting on and off the exam table, or rising from her chair, but she could not squat fully. (R. at 146.) Ultimately, Dr. Aldea diagnosed low back pain with a "fair" prognosis. (R. at 147.) In sharp contrast to Dr. Leone, Dr. Aldea determined that Hach "has no limitation for walking or standing, mild limitation for climbing and bending, and moderate limitation for lifting and squatting secondary to low back pain." (R. at 147.)

     C.     Consulting Physician – Dr. Bernard Gussoff

     Dr. Gussoff, an internist, testified as a medical expert at the administrative hearing. (R. at 236-45.) Dr. Gusoff never examined plaintiff, but had reviewed the reports of Drs. Leone and Aldea. He testified that Dr. Leone's medical reports never found any "severe limitations," though he noted that the "resolved lumbar herniated disc with radiculopathy" was "a bit of an inconsistency, but it's possible." (R. at 236.) He opined that her impairment did not meet Section 1.04 of the Listing of Impairments in the Social Security Regulations (R. at 235), but acknowledged that Hach probably had secondary arthritis in light of her disc herniation, and that post-traumatic arthritis can be "debilitating if it causes severe pain." (R. at 239-40.) However, Dr. Gusoff referred to Dr. Aldea's examination and noted that in the "overall composite picture, she is not bedridden," "not confined to her house," "does not take analgesic," and is "able to drive a car," indicating that "the arthritis is certainly not very advanced and maybe [I'd] use the word 'minimal.'" (R. at 241.) Dr. Gusoff did not "have reason to question [Hach's] credibility," and noted that she was hurting, but not "to the point where her activities limit her to the house, to bed, where she has not had the need to take anything stronger than Tylenol." (R. at 243.)

## IV. Vocational Evidence

Amy Leopold testified at the hearing as a vocational expert. (R. at 244-47.) She identified plaintiff's prior work as a traffic manager, and located it in the Dictionary of Occupational Titles ("DOT"), which listed it as a "sedentary" position. (R. at 245.) She opined that if Hach were found to be able to do sedentary or light work, she would be able to return to her prior position. (Id.) Leopold acknowledged that Hach's self-description of the time she spent standing and doing other activities in her job did not fully comport with the description of her job in the DOT, since Hach described a job between sedentary and light exertion, but she insisted that the DOT "adequately and completely explains the position that she did." (R. at 246-47.)

## Discussion

Plaintiff argues that the Commissioner has not demonstrated that she was capable of performing her usual work, and therefore that the conclusion that she is not entitled to disability benefits is not supported by substantial evidence. Specifically, plaintiff argues that in reaching the determination that she had sufficient residual functional capacity to perform her prior work, the Commissioner and the ALJ: (1) failed to accord proper weight to the opinions of her treating physician, Dr. Leone; and (2) failed to properly consider her own subjective complaints of pain.

## I. Legal Standards

### A. Standard of Review

Section 405(g) of the Act empowers district courts to review a disability decision of the Commissioner and affirm, reverse, or modify that decision, "with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g); see Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2004) ("Butts I"). Yet, this power of review is not unbounded. When evaluating a determination by the Commissioner to deny a claimant disability benefits, the Court may reverse the decision only if it

is based upon legal error or if the factual findings are not supported by substantial evidence.

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

Courts are advised to "keep[] in mind that it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). When evaluating the evidence, "the court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).

B.     Standards for Entitlement to Benefits

To be eligible for disability benefits, a claimant must establish that she was disabled within the meaning of the Act prior to the expiration of her insured status. 42 U.S.C. §§ 423(a)(1)(A), 423(c). The SSA has promulgated a five-step sequential analysis that an ALJ must use to determine whether a claimant qualifies as disabled. See, e.g., Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). First, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the ALJ must determine whether the claimant has a "severe" impairment that limits her work-related activities. 20 C.F.R. § 404.1520(a)(4)(ii). Third, if such an impairment exists, the ALJ evaluates whether the impairment meets or equals the criteria of an impairment identified in the Commissioner's appendix of listed impairments. 20 C.F.R. § 404.1520(a)(4)(iii). Fourth, if the impairment does not meet or equal a listed

impairment, the ALJ must resolve whether the claimant has the residual functional capacity to perform her past relevant work.[5] 20 C.F.R. § 404.1520(a)(4)(iv). This step requires that the ALJ first make an assessment of the claimant's residual functional capacity generally. 20 C.F.R. § 404.1520(e); id. § 404.1545. Fifth, if the claimant cannot perform her past work, the ALJ determines whether there is other work that the claimant could perform. 20 C.F.R. § 404.1520(a)(4)(v). In making his determination, the Commissioner must consider four factors: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).

The claimant bears the burden of proof as to the first four steps. See, e.g., Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998). If the claimant proves that her impairment prevents her from performing past relevant work, the burden shifts to the Commissioner at the final step. Id. "[T]he ALJ considering the administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits." Pierre v. Astrue, 09-CV-1864, 2010 U.S. Dist. LEXIS 895, at *20 (E.D.N.Y. Jan. 6, 2010) (citing 20 C.F.R. § 416.1400(b); Sims v. Apfel, 530 U.S. 103, 110-11 (2000)).

## II.    The ALJ's Decision

In his written decision, after setting forth the five-step process to determine disability, the ALJ delineated in some detail the medical reports of Drs. Leone and Aldea, including the results of physical examinations and Hach's self-reports of symptom improvement. (R. at 17-20.) The parties do not dispute the ALJ's findings that Hach: (1) has not engaged in substantial gainful

---

[5]    Under the regulations, "past relevant work" is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1).

activity subsequent to the alleged onset date; (2) met the non-disability requirements for benefits through the date of the decision; (3) has medically determinable severe impairments within the meaning of the Act; and (4) does not have any medically determinable impairment that meets the requirements of a listed impairment in the Commissioner's index. (R. at 20, 22.) Therefore, the ALJ's findings with respect to steps one to three of the five-step analysis are uncontroversial.

The lone challenge on appeal is with respect to the ALJ's finding at step four that Hach has the residual functional capacity to perform the "full range of sedentary work" including her "past relevant work."[6] (R. at 22.) The ALJ discussed – and apparently credited – Dr. Aldea's report, finding that Hach could stand, sit, or walk for up to 6 hours in an 8 hour day, and lift no more than 10 pounds in an 8 hour day. (R. at 21.) Also crediting Leopold's vocational testimony, the ALJ stated that Hach's prior employment was "exertionally sedentary" and that she could return to that position.[7] (Id.)

The ALJ explicitly addressed the disability opinion of Dr. Leone, explaining that "Social Security Regulations sections 404.1527 and 416.927, as well as Social Security Ruling 96-2p address the matter of giving controlling weight to treating source medical opinions." (Id.) He explained that no controlling weight could be given to such opinions unless they are "well supported by medically acceptable clinical and laboratory techniques", and even if so supported, the opinion must be "consistent with other substantial evidence of record." The ALJ determined, however, that Dr. Leone's opinion did not deserve "controlling, or even great, weight" because it was "not sufficiently supported by objective evidence on record." The medical findings on

---

[6] Although the ALJ never explicitly discussed step five, his finding that Hach could perform any sedentary job constitutes a conclusion that Hach would not be disabled under that step either.

[7] The relevant regulations define "sedentary work" as work that "involves lifting no more than 10 pounds at a time," "sitting," and "a certain amount of walking or standing," and occasionally lifting light objects. 20 C.F.R. § 404.1567(a).

physical examinations of "some limitation of motion of the lumbar spine and some tenderness, but no spasm or significant neurological abnormalities" were deemed inconsistent with "allegations of disabling back pain." (Id.)

The ALJ also considered – but put little stock in – plaintiff's own allegations of her symptoms and functional limitations, citing to "20 C.F.R. 404.1529; 416.929" in holding that such allegations must "find objective support in the record." (Id.) Here, the ALJ found that Hach's assertions were not so supported, noting that her medical treatment was conservative, she never required hospitalization or surgical intervention after 2001, epidural injection and physical therapy yielded good results, her medications were not unusual in type or dosage, and there was no indication that her medications produced any side effects. In light of these factors, the ALJ held plaintiff "not entirely credible" and discounted her claims. (Id.)

## III.    Residual Functional Capacity

Residual functional capacity is the assessment of the maximum level of activities a claimant can still perform despite the physical and mental limitations that affect what the claimant can do in a work setting. 20 C.F.R. § 404.1545(a)(1). The analysis of residual functional capacity is not focused on the nature of the limitations, but rather what work, if any, a claimant can perform after taking into account her limitations. See Hall v. Astrue, 06-CV-1000, 2009 U.S. Dist. LEXIS 66498, at *23 (E.D.N.Y. July 30, 2009) (citing Beckwithe v. Barnhart, 371 F. Supp. 2d 195, 201 (E.D.N.Y. 2005); 20 C.F.R. § 416.945(a)(1)). The finder of fact must consider all of a claimant's impairments and all relevant medical or other evidence in determining residual functional capacity. See 20 C.F.R. §§ 404.1520(e), 404.1545; SSR 96-8p.

### A.    The Treating Physician Rule

Plaintiff, noting that her "treating orthopedic surgeon has deemed her to be totally

disabled" (Pl. Br. at 15), argues that the ALJ failed to follow the regulation requiring that a treating physician's medical opinions "on the issue(s) of the nature and severity of [a claimant's] impairments" be accorded "controlling weight" when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial [record] evidence." 20 C.F.R. § 404.1527(d)(2); see also Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993) (upholding the validity of the regulation); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (finding the treating physician's opinion not controlling when it was contradicted by "other substantial evidence on the record"). "The Commissioner must set forth 'good reasons' for failing to accord the opinions of a treating physician controlling weight", Ligon v. Astrue, 08-CV-1551, 2008 U.S. Dist. LEXIS 103876, at *27 (E.D.N.Y. Dec. 23, 2008), and failure to do so can constitute a ground for remand. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). An ALJ who refuses to accord controlling weight must still consider the following "factors" to determine how much weight the treating physician's opinion should be given: (1) the frequency of examination and the length, nature, and extent of the treatment; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the opinion is from a specialist; and (5) other factors brought to the SSA's attention that tend to support of contradict the opinion. 20 C.F.R. § 404.1527(d)(2); see Halloran, 362 F.3d at 32 (2d Cir. 2004); King v. Astrue, 09-CV-1244, 2009 U.S. Dist. LEXIS 95938, at *23 (E.D.N.Y. Oct. 14, 2009).

As an initial matter, although the treating physician rule potentially applies to Dr. Leone's opinion regarding the nature and severity of plaintiff's impairments, it does not apply to his ultimate conclusion in several reports that plaintiff was "totally disabled" and "unable to work." 20 C.F.R. §§ 404.1527(e)(1) explicitly provides that "statement[s] by a medical source

that you are 'disabled' or 'unable to work'" do not constitute "medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner." Accordingly, the Commissioner need "not give any special significance to the source" of those opinions. Id. § 404.1527(e)(3); see Snell, 177 F.3d at 133. The regulations also make clear that Dr. Leone's statements regarding plaintiff's "residual functional capacity" are also not entitled to special deference. 20 C.F.R. §§ 404.1527 (e)(2) & (e)(3). Although the distinction may at times appear subtle, the Commissioner is only required to specify some accordance of weight to a treating physician's opinions regarding a plaintiff's physical and mental capabilities and limitations, not the physician's purported conclusions regarding how those attributes may play out in an employment context. See Id. § 404.1513(c)(1) (permitting the ALJ to consider an "acceptable medical source's opinion about your ability, despite your impairment(s), to do work-related activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling"); see generally Delk v. Astrue, 07-CV-167, 2009 U.S. Dist. LEXIS 19799, at *18-*22 (W.D.N.Y. Mar. 11, 2009) (discussing this distinction).

Here, the ALJ did not commit legal error in refusing to give Dr. Leone's opinion on the nature and severity of Hach's impairments controlling weight, and reasonably concluded that there was substantial evidence on the record inconsistent with that opinion. As early as May 2003, physical examinations revealed fairly strong motor strength and intact sensation, and by June, Hach had a full range of motion and no radiculopathy below her hips. (R. at 105-07.) Although some pain symptoms recurred over the following year, Hach remained neurologically intact, and by late 2004 an MRI indicated resorption of herniated fragments. (R. at 120.) The record evidence also included positive self-reports from plaintiff herself contained in Dr. Leone's notes, Dr. Aldea's physical examination, and Dr. Gussoff's analysis, the latter of which

concluded that, despite some physical limitations, plaintiff did not appear to be severely impaired. These facts on the record are sufficient to deny controlling weight to Dr. Leone's opinion. See Ellington v. Astrue, 641 F. Supp.2d 322, 330 (S.D.N.Y. 2009) ("While this Court may not completely agree with the ALJ's rationale, the Court does agree that [the consulting physician's] findings comprise substantial evidence that is inconsistent with [the treating physician's] conclusion. . . . This contradiction is enough to support the ALJ's finding that [the treating physician's] opinions were not controlling."). Considering the record as a whole, this Court cannot say that the ALJ has, as plaintiff argues, "arbitrarily substitute[d] his own judgment for competent medical opinion."[8] (Pl. Br. at 16.)

However, the ALJ did commit legal error in failing to properly determine *how much* weight should be afforded to Dr. Leone's opinion. While the ALJ's statement that Dr. Leone's opinion was "not given controlling, or even great, weight" may be read to imply that the opinion would get *some* weight, it is not clear from the opinion that *any* weight was accorded, which, if true, would be improper without examining the factors set forth in 20 C.F.R. § 404.1527. See Foxman v. Barnhart, 157 Fed. Appx. 344, 346 (2d Cir. 2005) (noting that "an ALJ is entitled . . . to disregard the opinion of a treating physician altogether . . . but only if the ALJ's decision is based upon proper consideration of the [§ 404.1527] factors"); Ellington, 641 F. Supp.2d at 330 ("The regulations are clear that a treating physician's opinion should not be completely rejected if that opinion is found to be non-controlling."); see, e.g., Pierre, 2010 U.S. Dist. LEXIS 895, at *25 (noting that the ALJ "failed even to mention the weight [the treating physicians'] opinions were given (except to say it was not 'great')"). Although the ALJ referenced "section 404.1527"

---

[8]   This is not to say, of course, that the record is devoid of evidence consistent with Dr. Leone's conclusion. While treating Hach, Leone noted in the March 10, 2006 questionnaire a number of anatomical deficiencies, such as Hach's reduced range of motion, abnormal gait, and sensory loss. Even Dr. Aldea found some restriction in motion. As discussed above, it is for the ALJ, and not a reviewing court, to resolve such conflicting evidence.

as a regulation that "address[es] the matter of giving *controlling* weight" (emphasis added), he

did not explicitly employ the multi-factor analysis and denied "even great" weight solely because

he concluded that the objective evidence was inconsistent with Dr. Leone's opinion. Although

this finding dovetails with the second and third factors, the ALJ did not discuss factors that

would weigh heavily in favor of according greater weight here, such as examination frequency,

length of treatment, and whether the opinion is from a specialist. The ALJ's incomplete analysis

on this score constitutes proper grounds for remand. See, e.g., Ellington, 641 F. Supp.2d at 331

(Where "the ALJ did address the third and fourth factors . . . [but] made no mention of important

factors such as the length and frequency of the treating relationship . . . the [ALJ] was obligated

to give a more complete explanation as to why the balance of factors pointed against [the treating

physician's] conclusions."); Hodge v. Astrue, 07-CV-0162, 2009 U.S. Dist. LEXIS 57770, at

*27-*28 (N.D.N.Y. July 7, 2009) (remanding because it was "not clear whether the ALJ used

these factors in determining what weight to give the treating physicians' opinions" and only

stated that "their reports were inconsistent with the record"); Baybrook v. Chater, 940 F. Supp.

668, 674 (D. Vt. 1996) (rejecting Commissioner's argument that the relevant factors were

considered "in substance" where the ALJ's opinion failed to describe "the length and frequency

of the services provided" or "the nature of the claimant's relationship with his physician").[9]

---

[9] Some courts have been willing to overlook an ALJ's lack of specificity in analysis where a "review of
the record indicates that the ALJ's decision was supported by substantial evidence." Bates v. Astrue,
04-CV-1118, 2009 U.S. Dist. LEXIS 115890, at *41 (N.D.N.Y. Dec. 11, 2009); see Halloran, 362
F.3d at 32 (concluding that the ALJ "applied the substance of the treating physician rule").
Nonetheless, these cases emphasize the importance of providing "good reasons" for assigning a given
weight to an opinion. See Id. at 33 ("We do not hesitate to remand when the Commissioner has not
provided 'good reasons' for the weight given to a treating physicians opinion"). It is a close question
whether the ALJ here applied the "substance" of the multi-factor test, particularly in light of his
reference to the relevant regulation numbers. However, since Dr. Leone was both a specialist and
treated plaintiff on many occasions over several years, and because even the consulting doctors found
evidence of some limitations, the Court is particularly wary of the ALJ completely overlooking those
factors in according the proper weight to Dr. Leone's medical opinions.

Although remand is appropriate so that the ALJ can properly determine what weight to accord Dr. Leone's opinion, the Court does not accept plaintiff's invitation to require the ALJ to subpoena supplemental information from Dr. Leone. No one disputes that "the ALJ generally has an affirmative obligation to develop the administrative record." Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). Plaintiff falters on her inability to point to any "clear gaps" or "deficiencies" in the record that would require the ALJ to seek out additional information. Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999); see Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998). On the contrary, the Hach record below is replete with clinical reports and residual functional capacity questionnaires authored by Dr. Leone over several years, including results of physical examinations and interpretations of MRI scans. The ALJ also has the benefit of Dr. Aldea's examination and Dr. Gussoff's expertise. While the ALJ may find it useful on remand to investigate further why Dr. Leone's disability conclusions seem at odds with some of his own clinical findings, the Court cannot say that the administrative record as it stands is insufficient for the ALJ to determine the proper weight to accord Dr. Leone's opinion.

B.     Subjective Complaints of Pain

Plaintiff also argues that the ALJ improperly discredited her subjective complaints of pain limiting her residual functional capacity. In assessing whether a claimant is disabled, the Commissioner must consider all symptoms, "including pain, and the extent to which [those] symptoms can reasonably be accepted as consistent with the objective medical evidence." 20 C.F.R. § 416.929(a). Nevertheless, "[s]tatements about a claimant's pain cannot alone establish disability; there must be medical evidence that shows that the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged." Davis v. Massanari, 00-CV-4330, 2001 U.S. Dist. LEXIS 19747, at *6

(S.D.N.Y. Nov. 29, 2001); cf. Simmons v. U.S.R.R. Retirement Bd., 982 F.2d 49, 56 (2d Cir. 1992) (noting that "a claimant's subjective evidence of pain is entitled to great weight where . . . it is supported by objective medical evidence"). If testimony regarding disabling pain is not fully supported by clinical evidence, the ALJ must consider the following factors to assess such testimony: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment other than medication that claimant has received; (6) any measures the claimant uses to relieve pain or other symptoms (e.g., lying flat on the back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (7) other factors concerning claimant's functional limitations and restrictions. 20 C.F.R. § 404.129(c)(3).

"An ALJ rejecting subjective testimony must do so explicitly and with specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." Owens v. Astrue, 06-CV-736, 2009 U.S. Dist. LEXIS 102277, at *20 (N.D.N.Y. Nov. 3, 2009). However, the Court keeps in mind, as it must, that "[i]t is the function of the [Commissioner], not [the reviewing courts], to . . . appraise the credibility of witnesses, including the claimant." Netter v. Astrue, 272 Fed. Appx. 54, 55 (2d Cir. 2008) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1982)); see King, 2009 U.S. Dist. LEXIS 95938, at *37. Furthermore, "where the ALJ's decision to discredit a claimant's subjective complaints is supported by substantial evidence, we must defer to his findings." Calabrese v. Astrue, 2009 U.S. App. LEXIS 28161, at *9 (2d Cir. Dec. 23, 2003); see Aponte v. Sec'y of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984).

On this point, the ALJ's determination that Hach's testimony was "not entirely credible" was supported by substantial evidence. As early as May and June 2003, plaintiff reported feeling better following epidural procedures and even stated that she "can live with her present level of functioning." By August 2003, her pain was a "2 out of 10." Physical examinations by Dr. Leone revealed her to be "neurologically intact" and by October 2004 there was resorption of her disc fragment. Still, the ALJ once again referenced the applicable regulations but failed to specifically account for the factors that they require he consider. In this instance, though, it is clear that at least some of the factors were considered. For example, the ALJ noted that Hach took no unusual medications, that medications she did take did not appear to have any side effects, and that injection and physical therapies yielded good results (i.e. factors (4)-(6)).[10] Further, without specific reference by the ALJ, Hach's own applications demonstrated that she participates in daily activities like food preparation, short walks, and small errands in the neighborhood. Dr. Gussoff used this information to conclude that Hach was not in severe, debilitating pain. Viewed in the totality of the record and coupled with the deference due the ALJ's credibility determinations, the Court cannot find the ALJ's conclusion about Hach's subjective complaints of pain as lacking in credibility to be in error.

### Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied, and Hach's cross-motion is granted to the extent that the ALJ's decision is vacated and the matter remanded for reconsideration consistent with this Memorandum and Order. Specifically, the ALJ is directed to reassess the proper weight to be accorded to Dr. Leone's

---

[10] The ALJ also noted that Hach's medical treatment was "conservative." But, "conservative treatment for pain is not, in and of itself, a sufficient basis for rejecting an applicant's complaints." Rivera v. Barnhart, 04-CV-6149, 2005 U.S. Dist. LEXIS 36968, at *29 (W.D.N.Y. Dec. 9, 2005). More importantly, in any case, the ALJ did not exclusively rely on Hach's conservative treatment in making his determination.

opinion of Hach's residual functional capacity in light of the factors enumerated in 20 C.F.R. §

404.1527(d)(2), and to reconsider Hach's claim of disability in light of that reassessment.


SO ORDERED.


Dated: Brooklyn, New York
      March 19, 2010


_____
ERIC N. VITALIANO
United States District Judge